ROB ROY. The (UNITED STATES v.). See Case No. 16,179.

---

## Case No. 11,971.

### ROBSON v. The HUNTRESS.

[2 Wall. Jr. 59; 4 Am. Law J. (N. S.) 140; 25 Hunt, Mer. Mag. 336.] [1]

Circuit Court, E. D. Pennsylvania. April, 1851.[2]

SALVAGE—NATIONAL VESSEL—PRACTICE—FOREIGN CONSUL.

1. The officers and crew of a foreign vessel of war are entitled to salvage in causes, civil and maritime, as other vessels are.

2. A consul of a foreign power, though not entitled to represent his sovereign in a country where the sovereign has an ambassador, is entitled to intervene for all subjects of that power interested: and though he should not set forth the particulars of his claim, still it will do if they can be fully gathered from the allegations of the libel and the case it sets forth.

3. Application of the principle of salvage to particular facts, and amount of salvage fixed in them.

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

The Huntress, an American brig, bound on a trading voyage to Sierra Leone, and other places on the west coast of Africa, was fallen in with, off Cape Lopez, (lat. 2° 30′ N., lon. 9° 45′ E.,) by the Jackall, a steam tender to H. B. M.'s ship Gladiator. The brig had her flag hoisted union down, which is the ordinary signal of distress. On boarding her, it was found that her captain had died some time before, and that the first mate, having been taken with the coast fever, was lying senseless, apparently near his end. The crew was composed of five coloured men and one white man, the second mate. The second mate and some of the crew understood how to sail the vessel practically, i. e. to put her about, &c., and had been on the coast of Africa before; but none of them understood theoretical navigation, could take an observation, or make a reckoning; nor could the second mate either read or write. They had been sailing for four days at random; sometimes approaching land, and then bearing away to avoid running ashore, or to escape from piratical looking boats: and seeing, as they thought, a French brig at anchor, they were about to run into what they supposed the river Gaboon, but which was in fact a small inlet two hundred miles further north. In this condition, they put themselves into the charge of the Jackall: and Lieut. Bedingfield, its commander, having put the master's assistant of that vessel, on board, this person after twenty-four hours' sailing brought the Huntress to the island of Fernando Po, in a cove of which the Gladiator was lying at anchor. Here the British

---

commander, Capt. Adams and the other officers of the Gladiator did what they thought the case required. Their surgeon came on board to the aid of the mate, but he was already dead. The vessel was supplied with water, medicines, and stores. An anchor was furnished her to replace one she had lost. The property on board was collected, carefully inventoried, and sealed up. Disinfectants were employed to remove or diminish the causes of disease· on board. And with the assent of the second mate, and in accordance with his opinion as to what was best for the owner's interest, it was determined to send the Huntress home to the United States. Lieut. Robson, of the royal navy, was placed on board to navigate her, and two men to complete her effective complement; three of her surviving company being at the time off duty in consequence of sickness. She was then despatched to this place, where her owners reside. The coast fever, of which the mate and probably the captain also had died, is known to be malignant: and, notwithstanding precautions which had been taken to disinfect the Huntress, and though Lieut. Robson kept clear of the cabin as much as possible; sleeping on deck, and going below only to make out his reckonings, he was attacked by this disease a few days after leaving the coast, and struggled with difficulty, and through much danger against its effects, until he reached this country. On his arrival here, sixty-nine days after leaving Fernando Po, he was so ill that his physician considered him "unfit to be moved;" and the libel alleged that his health had been so much shattered that he would be permanently prevented from resuming a post on the African coast, or from again visiting it. In the course of his voyage to the United States, Lieut. Robson encountered some insubordination from his only officer, the original second mate of the Huntress, whom he suspended for some time from duty, and afterwards brought into obedience. Having brought the vessel safely to this port, Lieut. Robson, for himself, and the British consul at Philadelphia "for all others interested," filed their libel against her, in a cause of salvage, civil and maritime. The libel set out the case particularly in all respects, except stating specifically for whom the consul appeared. The original voyage, of course, was broken up.

It was contended by H. J. Williams, G. M. Wharton, and J. W. Biddle, in the district court, whence the case came here by appeal:

I. That the libel, so far as any body else than Lieut. Robson was concerned, was wholly deficient in certainty; it not showing with any precision, for whom the British consul was acting, nor for what service he claimed salvage.

II. That however a consul might have a right to represent subjects, he had no right to represent his sovereign in a country where that sovereign had, as here, an ambassador resident; that salvage could not be claimed

by a vessel of war of a foreign country; or at any rate that unless the ambassador intervened in behalf of his sovereign or of the British admiralty as owner, the third part usually decreed to owners for the risk incurred by their property, would be considered as waived.

III. That there was, in this case, no salvage service, in the proper sense of the phrase: that there was no voluntary risk, either of life, health or property, on the part of the British officers or men, in the services rendered to the Huntress: that the vessel was not saved from destruction, by anything done for her, because she was not at the time in peril of destruction: that those on board of her, could easily have preserved her from that: that even if she were so saved, it was by bringing her into Fernando Po, where she was certainly safe: that the subsequent conducting her to Philadelphia, could not constitute salvage, and however well meant, was really injurious to her owners, by breaking up the voyage. The sickness of Lieut. Robson on the homeward voyage, was but an incident, not caused by the service, nor really growing out of it, and was not a risk attendant upon it, nor one which he voluntarily incurred; nor was it a circumstance that enhanced the merit of his labour, any more than his accidental falling from the rigging and breaking of a limb, (had this occurred,) would have done so. He could be fully compensated by paying him for his lost time at the usual rate paid to navigators: that the service rendered by Lieut. Bedingfield and the master's assistant amounted to nothing more than towage: that there was no feature in the case which called for the application of the rule of per centage upon the value of vessel and cargo, to the measure of compensation to the libellants: that there could be no constructive salvage service; it must be real, actual and personal; and this disposed of the pretensions of all who did not actually labour for her rescue, if in danger.

IV. That on the west coast of Africa, between Monrovia and the part of the coast where the brig fell in with the Jackall, are a number of trading ports, at many of which—as might be naturally inferred—a navigator might have been obtained from some of the vessels trading there, viz., Cape Mesurado, Grand Bassa, Cape Palmas, Jack Lahua, Dix Cove, Elmina, Cape Coast Castle, Anambooa, Accra, Lagos River, Loo Boo, Calabar Bonny, and others: that at Sierra Leone, which is a large settlement, with considerable trade, a competent navigator might have been obtained on shore; and that at the island of St. Thomas, a Portuguese settlement, where vessels of the American squadron are in the habit of calling, there are several vessels owned by residents of the place trading with different European ports, whose officers and crew make their homes at the island, some one of* whom could very probably have been in-

duced to take charge of the brig, and thus any necessity of sending the libellant and the vessel home, and breaking up the voyage, might have been avoided: that certainly a navigator might have been found there to bring her home: and that Lieut. Robson having chosen to act in the capacity of an ordinary navigator, was to be paid only the services of such a person.

On these arguments, and on the general question of amount of salvage, the opinion of the district court was given substantially as follows, by KANE, District Judge:

"One of the parties libellant (Lieutenant Robson) is himself a direct party in interest, and so represents himself; and the vessel, once brought into the custody of the admiralty, upon his libel alone, would be retained here till all other interests had an opportunity of presenting themselves for hearing against her. Were he the only party before me, and it came to my knowledge, either from the pleadings or the proofs, that other meritorious salvors were by force of circumstances, prevented for the time from asserting their right formally against this vessel, I should have no hesitation in impounding in the registry such sum as they appeared entitled to, to await their legal demands. But this is not exactly such a case. The British consul makes himself a party 'for all others interested;' and though it would certainly have been more regular to set forth their names, or otherwise designate them in the caption of the libel, yet the defect must be regarded as merely formal, since it is supplied adequately by the rest of the instrument, which sets forth the history of the case in such a way, that I can infer whom he represents. As to the other suggestions, I must frankly say, that had the conduct of Captain Adams been in accordance with them, it would have wanted much of the merit which I now ascribe to it. Had he sent the brig on a vague and roundabout hunt for a consignee, expensive, of course, and probably fruitless; or had he trusted her with her cargo to some navigator enlisted by chance on a coast rife with piracy; or had he, after securing her safety, left her at Fernando Po, with her crew of half-breeds and negroes, to eat up or spoil upon the property of her owner; or had he even followed an example found in our diplomatic records, and detained her while he could arrange by contract the just value of the services he had rendered, and was about to render, I apprehend that a court of admiralty would have been very reluctant indeed to table a large decree in his favour. It is to his praise, that what he did was the reverse of all this: it was well judged, liberal, protective of the interests which misfortune had cast upon him, and justly confiding withal towards the country whose citizens he had relieved or rescued.

"This conducts me to the remaining con-

sideration which should have influence on my decree: What obligations were there, resting upon these salvors, to do as they have done? Absolutely none, but those of human fellowship. They were strangers, subjects of a foreign power, at a great distance from home, armed and cruising for a special object, requiring their full complement of men to man prizes, and meet the ordinary casualties of a sickly climate. It illustrates the advancing civilization of the age, that alien flags are thus summoned on distant seas to perform offices of brotherhood, and the armament of war is found ministering to the charities of men. The considerations are higher and more noble than any of policy, that prompt us to foster the spirit which these salvors manifested by their conduct. Still, the task of adapting to it a pecuniary compensation is not easy. It refers itself largely to the judicial discretion. It is impossible to find in an adjudged case circumstances altogether parallel to those of the case before us. The Charlotte Wylie, 2 W. Rob. Adm. 495, was that of an English vessel, relieved and sent home by a cruiser of her own nation: her condition, too, was much less perilous; for she had an officer of her own on board capable of navigating her, and those who brought her to England did not suffer in health. The Amistad, 15 Pet. [40 U. S.] 518, approaches nearer to our case; but that had some of the features of a military service: there the decree was for one third. Referring myself particularly to the opinion of the supreme court in The Blaireau, 2 Cranch [6 U. S.] 240, and to the remarks of Mr. Justice Washington, in deciding Bond v. The Cora [Case No. 1,621], and those of Mr. Justice Story in Tyson v. Prior [Id. 14,319], I think I shall not depart widely from the principles which have governed our courts in cases of civil salvage, if I allow to the salvors one-fourth of the value of the property saved, after deducting the charges against it."

The value of the Huntress was $3,600, and that of her cargo $11,000, in all $14,600. From this his honor deducted charges for anchor, water, stores, &c., put on board at Fernando Po, $98.34; Lieut. Robson's charges for board, physician's bills and passage home, $395, some other small charges of the hands, in all $576.32: and of the balance $14,023.68, awarded one-fourth, $3,505.92, as salvage, in the manner following. 1. To pay the libellants, proctors and advocates, a reasonable sum. 2. Of the residue, one-third to Lieut. Robson. 3. The remaining two-thirds to Captain Adams and the officers and crew of the Gladiator and Jackall, including Lieut. Robson; in such manner as would be awarded by the English admiralty. [Case No. 6,912.]

The case coming on this decree of the district court, by appeal, into this court, the same general arguments used there were repeated and enlarged upon here. And it was further urged, that salvage for services rendered by national vessels, or vessels of war, was not known to the law, which allowed it only in favour of merchant seamen; and that even if the district court were right in its general principles, and in applying the doctrine of salvage to the case at all, it had misapplied them in awarding for salvage so much as one-fourth of the value of the vessel.

GRIER, Circuit Justice. It is no objection to a claim for salvage that the service has been rendered by the officers and crew of a national vessel; or that such vessel is in the service of the sovereign of a foreign nation.

The right of a consul to intervene on behalf of citizens of his own country who are absent but interested, seems too well established in practice to be doubted. He cannot intervene for his sovereign when such sovereign has a minister or ambassador resident in the country. Regularly he should state for whom he intervenes, more fully than is set forth in this bill. But this defect may be remedied as suggested, and carried out by the final decree.

I concur with the district court, that the services rendered by Captain Adams and Lieutenant Robson are highly meritorious, and partake of the nature of salvage service, and should therefore be liberally rewarded.

On principles both of policy and justice, salvage services should be estimated on a more liberal and enlarged scale than a mere compensation for work and labour. It is a reward for rescuing a ship from some impending danger and distress. Its ingredients are, 1st, enterprise in the sailors in rendering assistance in tempestuous weather, and at risk of life. Secondly, the degree of danger and distress from which the property is rescued. Thirdly, the degree of labour and skill displayed by the sailors, and the time they are occupied. And fourthly, the value of the property saved. When all these occur, a large reward ought to be given; but where none such, or scarcely any take place, the compensation can hardly be denominated a salvage reward; it is little more than a mere remuneration pro opere et labore. The Clifton, 3 Hagg. Adm. 120.

1. The Huntress, at the time these services were rendered, was not in immediate or imminent peril; though from the sickness of her commander (the first mate,) and the nautical ignorance of the second mate, on whom the command devolved, she had been brought into a situation where it was highly probable she might incur great danger. The danger from pirates is perhaps more imaginary than real; it may have been possible, though not probable, on a coast frequented daily by British war steamers. The men had sufficient skill to navigate the vessel clear of any visible dangers, such as running her on shore in the day time, though without knowledge sufficient to guide her through the ocean,

or to conduct her to her place of destination.

2. The assistance rendered to her by Lieutenant Bedingfield required neither enterprise nor risk of life or property. The crew of the Jackall rendered no service or labour whatever, nor were required to render any. The Jackall, a public vessel, was not diverted from the performance of her regular duty on the coast. The service rendered by Mr. Barret, though requiring the nautical skill of a pilot, subjected him to no unusual risk, and required no uncommon skill. The conduct of Lieutenant Bedingfield, Captain Adams and Mr. Barret in the whole transaction, was highly honourable and morally meritorious, though requiring no great enterprise or physical exertion, or subjecting them to unusual peril. But the services of Lieutenant Robson were undoubtedly characterized by all these qualities. I shall not stop to inquire whether the sickness, which attacked him after he went on board the Huntress, can be attributed to any peculiar infection to which he was subjected on board that vessel. It is enough that he suffered after he came on board; that he was cut off from medical assistance, and in great danger of life; and we do not know that any other cause produced the evil. Whether he can be said to have voluntarily encountered a danger which neither he nor Captain Adams anticipated when this service was undertaken; or whether if such a consequence had been anticipated, the danger would not have probably been encountered, are speculations which cannot affect the case.

Lieutenant Robson is, therefore, the only person who has incurred any hazard or unusual labour, or expended time or money in rendering salvage services to the Huntress. The other officers named rendered services undoubtedly meritorious and useful, and deserving a liberal reward from the owners of the Huntress; but the owners of the salving vessel (the British admiralty) and the crew rendered no service whatever that can be appreciated, and the case is not one of military salvage. The loss of the service of Lieutenant Robson, if of any importance to the admiralty, will be compensated by the deduction from his pay while out of actual service.

The practice of the last century in salvage cases is thus described by Sir Edward Simpson: "The maritime laws of England fix no certain proportion in cases of salvage, but are governed by circumstances of danger, hazard, trouble and expense of saving. An eighth or tenth, except in cases of extreme hazard, is as much as is usually allowed. In some cases of extreme hazard, one-third, one-fourth, one-sixth or one-ninth, or a sum of money only, on account of salvage is given." In this country in cases of derelict, or saving from imminent and impending destruction, with great hazard and labour, it is usual to allow a half, a third, or a fourth. The fact that one of a crew of eight persons coming from the coast of Africa, was taken with the fever, is no evidence that any uncommon or extreme hazard has been encountered.

As there are but four persons who have actually rendered any service at all to the Huntress; as three of these encountered no hazard, and performed no labour, except twenty-four hours' pilotage by one of them; as the vessel, though astray and lost in one sense of the word, was not in any immediate or imminent peril, I do not think it a case which calls for one fourth of the vessel and cargo, after paying all expenses, in order to give a liberal remuneration for the labour and peril encountered in rendering this service.

The decree is therefore modified as follows: —Out of the gross value of the Huntress and cargo, $14,600—

1. Pay expenses, &c., $576.32, as taxed by district court.

2. Taxable costs and proctor of libellants' fees reasonably due in district court, and taxable costs in this court.

3. To Lieutenant Robson, $1400; to Captain Adams, of H. B. M.'s ship Gladiator, $300; to Lieutenant Bedingfield, of the Jackall, $200; to master's assistant of the Jackall (Barrett), $100.