Petersen *v.* Brockelmann.

## New York Marine Court.

*General Term—January,* 1874.

## CHARLES PETERSEN *against* ERNST BROCK-ELMANN, OWNER OF THE BARK "ERNEST AND BENNO."

The jurisdiction of local courts in actions between foreigners, especially subjects of the same country, defined.

Motion to vacate a writ of attachment.

*Edward Salomon & Thomas Burke,* in support of the motion, referred to Lynch *v.* Crowder, 2 *Law Rep. (N. S.)* 355 ; Thompson *v.* The Nancy, *Bee's Adm.* 217 ; The Bee, *Ware,* 332 ; Gonzales *v.* Minor, 2 *Wall's Jr.* 348 ; Davis *v.* Leslie, 1 *Abb. Adm.* 123, 131 *et seq. ;* Barker *v.* Klorkgeter, *Id.* 402 ; The Napoleon, *Olc.* 208 ; The Infanta, 1 *Abb. Adm.* 263 ; Norberg *v.* Hillgreu, 5 *N. Y. Leg. Obs.* 177 ; The Elwin Kreglin, 9 *Blatchf.* 434 ; *Exp.* Newman, 14 *Wall.* 152 ; Treaty between United States and Germany proclaimed June 1, 1872, Art. XIII.

*R. W. Andrews & G. H. Smith,* in opposition, contended that the treaty did not, and could not, oust this court of its settled jurisdiction ; and that the court, in furtherance of justice, would not discontinue its aid in cases where foreign seamen sued for wages, even if the defendant was also a foreigner and a subject of the same kingdom. That the voyage was ended when the bark reached Hampton Roads, certainly when it arrived at the port of New York ; and that the words "and further," as used in the hiring of the plaintiff, are indefinite and of no legal import. That the suit is against the owner, and not the captain or other officers of the vessel, and, therefore, not within the terms of the treaty.

*Edward Salomon*, in reply : It appears by the affidavits and consular protest that, according to the rules and regulations of the shipping laws of the empire of Germany, the terms " to Hampton Roads, and further," bind the plaintiff to serve as sailor until the return of the vessel to a German port.  That this suit is within the meaning and spirit of the treaty, and is an interference in a difference between the captain and the seaman, concerning his wages and the execution of a mutual contract.

SHEA, Ch. J.—This is an action for seaman's wages. The motion is made to vacate a writ of attachment issued in this action, and to discharge from the custody of the local law the bark *Ernest and Benno*, the property of the defendant, now held by virtue of that writ. The defendant declines the jurisdiction of the courts of the State ; and the consul-general of the German empire, resident at the port of New York, presents an official protest to the court, denying its right to retain jurisdiction " especially " in " differences of any kind " " in reference to wages and the execution of mutual contracts," which may arise either in port or at sea, between captains, other officers, and crews of its merchant vessels.

These are the facts of the case : The bark *Ernest and Benno*, a private ship, Herman Weltzien, master, built at Anclam, in Prussia, and sailing under the flag, and belonging to the dominion, of the empire of Germany, is the property of the defendant, who is a subject of that empire.   While, in the course of a voyage, the bark was lying at the port of Rio de Janeiro, the plaintiff, who is a seaman, engaged there to perform the duty of a common seaman on board this vessel during the continuance of the voyage to Hampton Roads, Virginia, "and further."

The vessel sailed from Rio de Janeiro, reached

Peterson *v.* Brockelmann.

Hampton Roads September 6, 1873, and arrived at the port of New York on September 17, 1873. The plaintiff now claims wages as such seaman for services as far as New York. An order of attachment has been issued, on the application of the plaintiff, against the defendant's property found within the territorial jurisdiction of the court, upon the verified statements that such a claim justly exists, and that the defendant is a non-resident ; and, in pursuance of this common law writ and in accordance with the established procedure of the courts of this State, the bark named has been seized, and is now in the custody of the law, abiding the further order of the court in this action. The defendant, who professes to have a meritorious defense to the claim itself, limits himself now to "declining the jurisdiction" of this court over the cause ; and the consul-general of the German empire, on the application of the defendant, intervenes, and by consular protest asserts his "exclusive" jurisdiction over and charge of the internal order of the merchant vessels of that nation, and especially of all differences concerning the wages of seamen belonging to such vessels. The consular protest, among other circumstances, sets forth that "the consul-general never refused to entertain jurisdiction of the said matter in difference between the said plaintiff and the captain of said vessel, concerning the plaintiff's alleged wages or any other matter ; . . . . and that the consul-general and his representative have always been and are ready and willing to hear and determine said matter of difference sought to be litigated in this action ; and respectfully protests against the jurisdiction of this court in this action ; and on behalf of the German empire claims that this court, under the treaty (17 *U. S. Stat. at L.* Treaties, 125, 132), has no jurisdiction of the matter in difference in this action, but that jurisdiction thereof belongs exclusively to the consul-general."

It was suggested on the argument that the plaintiff's name does not appear on the ship's crew-list; but it is conceded that he became part of the ship's crew at Rio de Janeiro, and served as a seaman until the vessel came to the harbor of New York.

The question presented by this motion is supposed to be of importance. It calls for a consideration, perhaps an initiative construction of the meaning and effect, of the recent treaty with the empire of Germany. This, it is said, is the first time the question has been presented under this treaty for adjudication. It certainly affects an interest in international commercial intercourse from which a peculiar and very abundant litigation is produced, and upon which this court is frequently invited to adjudicate. It is clear, to those who have become acquainted with the way in which differences between the officers and seamen, not only as to causes arising on the high sea but in port, are adjusted through the mechanical procedure of some of our local tribunals, that it is commendable and prudent that this phase of litigation should be committed to, at least the supervisory care of, a public agent officially representing the country to which the merchant vessel looks for protection; and surely so where the difference concerns those only who are subjects of a foreign kingdom and to which none of our own citizens are necessarily parties. The requisite and regular operation of commercial transactions by merchant vessels in foreign ports may depend upon their exemption from the tardy progression and determination of a suit at common law; and the object of the voyage is liable to be delayed, checked, and impaired if the vessel is absolutely subject, in an ordinary suit by one of its crew, to be restrained of that liberty which is the incitement, to and life of commerce between maritime nations. When our own citizens or resident foreigners have substantial claims against those not residents of our State,

its laws permit any property within our territorial
jurisdiction, and belonging to the non-resident debtor,
to be taken by a writ of attachment, and held in the
custody of the law to satisfy the final decree of the
court, should judgment be finally pronounced in favor
of the claimant. And this is a positive jurisdiction
which our courts cannot refuse. And so it has come
that foreign seamen have been advised, instead of libel-
ing the vessel and thus proceeding *in rem* in a court
of admiralty and maritime jurisdiction by enforcing
the lien against the vessel itself, to resort to the courts
of common law and proceed ostensibly against the per-
son, but nevertheless attaching and holding the vessel
during the litigation. That the defendant may release
the vessel on giving approved surety is but a modifica-
tion of the procedure. This kind of use of the com-
mon law writ of attachment is nothing less than a libel
of the vessel, in practical effect; and one should feel
safe in declaring that it is an assumption of admiralty
and maritime jurisdiction, if it were not for the decis-
ion of the supreme court of the United States in
Taylor v. Carryl (20 *How. U. S.* 598), wherein it is said
that "the habit of courts of common law has been to
deal with ships as personal property, subject in the
main, like other personal property, to municipal au-
thority, and liable to their remedial process of attach-
ment and execution; and the titles to them, or con-
tracts and torts relating to them, are cognizable in
those courts." This doctrine was sanctioned as
justifiable by a bare majority of the court: the Chief
Justice, TANEY, writing the dissenting opinion, in
which WAYNE, GRIER, and CLIFFORD, JJ., concurred.
So, "the habit of the courts of common law" being
recognized as a source of jurisdiction, a process of
judicial "accretive development," we may also indulge
in taking such a jurisdiction, and do it safely enough
in cases where, as in this very Taylor v. Carryl, "there

is no objection on the part of the foreign shipowner or master; but, on the contrary, a general desire that the courts should do so " (p. 611). However, it is true that our courts of common law do " take jurisdiction " by attaching, when a suit is pending, the personal property, including private ships, within its territorial jurisdiction, belonging to a non-resident defendant, and, in some instances, even where both parties are subjects of the same foreign country. The ship, like any other kind of personal property, is held by mesne process to answer the event of a suit for mariners' wages, in like manner as if the suit were between two citizens of the United States of America, one being a non-resident. This " habit " is excused as being of a jurisdiction vaguely described as discretional with the court: belonging to a comity due from one civilized nation to another, and as a debt due to justice.

But the true doctrine and policy are expressed in the rule that litigation between foreigners, not naturalized nor permanent residents of our country, does not belong necessarily and positively to the internal jurisprudence of a State. Such litigants are, however, permitted, in the discretion of the local courts, in furtherance of justice and by the comity of nations, as it is called, to seek remedies under our administrative law upon contracts made in their own country; and the law of the place of the contract is the law which will be therein administered. It has been found expedient for nations to permit this in their mutual amicable relations, and chiefly for reasons of commercial intercourse. This comity does not belong directly to the individuals of each country, but belongs, and is ascribed, to the corporate national intercourse. It is acceded to and regulated by the nations as such; the individual is admitted to its benefits only because he is of that nation, and, through his country, receives a privilege given to its honor and dignity.

Petersen *v.* Brockelmann.

With the United States of America this privilege rests so entirely in its free and good will to other nations, expressed through its own courts, that it does not require reciprocity of benefits to sustain it.  " No such discrimination has ever been made by congress, and no court could make it by mere construction without an exercise of judicial legislation.  The cannibal of the Fejees may sue here in a personal action, though having no courts at home for us to resort to " (WOODBURY, J., Taylor *v.* Carpenter, 2 *Woodb. & M.* 11).

There can be no doubt that the power of this court to act in this kind of cause is as full and comprehensive as that of any other court of record in this State ; and if any State court has it, this court has also (*Laws of N. Y. of* 1872, c. 629, § 3, subd. 1, §§ 13, 14).

By the courts there seems to be claimed an inherent capacity to take jurisdiction in some cases where all parties to the litigation are foreigners, and subjects of the same country ; but whether the court will refuse or accept jurisdiction rests in its own discretion. " Where both parties are foreigners I am inclined to think it must, on principles of policy, often rest in the sound discretion of the court to afford jurisdiction or not, according to the circumstances of the cases. To say that it can be claimed in all cases, as matter of right, would introduce a principle which might, oftentimes, be attended with manifest disadvantage, and serious injury to our own citizens abroad as well as to foreigners here " (Gardner *v.* Thomas, 14 *Johns.* 138). All courts of a general jurisdiction, and this court is unlimited by local law in its jurisdiction over this class of marine causes, are governed by, or at least adhere to, rules of law settling the boundaries of their jurisdiction.  No court known to our system " administers justice in general " (per MAULE, J., in De Bode *v.* Regina, 13 *Ad. & Ellis* [*N. S.*] 386, note).

This court early recognized the moral obligation to

afford jurisdiction in cases between foreigners; where, if the opportunity were allowed to pass, justice would be hopelessly defeated ; yet this act of intervening jurisdiction among strangers was always to be guided and governed by a sound discretion.   It was a juris- diction concurrent with the courts of other countries mindful of the same reason.   It, however, acknowl- edged a great principle of protection to commerce and to the respective rights of independent nations, years afterwards to be asserted and established by our country, through the patriotic solicitude and diplo- matic ability of Daniel Webster, as an indisputable maxim of commercial freedom and protection and of the inviolability of national sovereignty.*   At an earlier

---

* " The rule of law, and the comity and practice of nations, go much further than these cases of necessity, and allow even to a mer- chant vessel, coming into any open port of another country volun- tarily, for the purposes of lawful trade, to bring with her and keep over her, to a very considerable extent, the jurisdiction and authority of the laws of her own country, excluding to this extent, by conse- quence, the jurisdiction of the local law.   A ship, says the publicists, though at anchor in a foreign harbor, preserves its jurisdiction and its laws.   It is natural to consider the vessels of a nation as parts of its territory, though at sea, as the State retains its jurisdiction over them; and, according to the commonly received custom, this jurisdic- tion is preserved over the vessels, even in parts of the sea subject to a foreign dominion.   This is the doctrine of the law of nations, clearly laid down by writers of received authority, and entirely conformable, as it is supposed, with the practice of modern nations. . . . . It is true that the jurisdiction of a nation over a vessel belonging to it, while lying in the ports of another, is not necessarily wholly exclu- sive.   We do not so consider or so assert it.   For any unlawful acts done by her while thus lying in port, and for all contracts entered into while there by her master or owners, she and they must, doubtless be answerable to the laws of the place.   Nor, if her master or crew, while on board in such port, break the peace of the community by the commission of crimes, can exemption be claimed for them.   But, nevertheless, the law of nations, as I have stated it, and the statutes of governments founded on that law, as I have referred to them, show that enlightened nations, in modern times, do clearly hold that the

Petersen v. Brockelmann.

day it was barely admitted " that by the law of nations every country has a right of jurisdiction over all matters arising on board its vessels," yet, " that this jurisdiction is not exclusive," although the merchant vessels are said " to be an extension of the territory " of the particular country to which they belong. In 1816, the case of Juan de Salez v. Jose de Souza brought before the marine court this question of jurisdiction, in a cause between two foreigners. The action was for an injury to the person, committed on the high seas; the parties were subjects of the same country. The opinion of the court was delivered by that universal, erudite and learned jurist, Mr. Justice HENRY WHEATON, then an associate judge of this court, and afterwards author of the *Elements of International Law*. The parts of the opinion which appear to illustrate the doctrine now under consideration are those in which he says : " The action is not local by our municipal law, or by the law of any other country ; it is an action *in personam*, and the parties are now in this forum. *Actiones personales sequuntur forum rei*, is the maxim of the common law, which is our peculiar code, and also of the civil law, which is the basis of the law of all the countries in the south of Europe." " Will, then, the circumstances of the parties being foreigners have the effect of ousting the court of its jurisdiction ? Upon principle there are only two considerations which should seem to favor an affirmative answer to this question. The first is said to be, that the mutual obligations, the respective rights and

jurisdiction and laws of a nation accompany her ships not only over the high seas, but into ports and harbors, or wheresoever else they may be water-borne, for the general purpose of governing and regulating the rights, duties, and obligations of those on board thereof, and that, to the extent of the exercise of this jurisdiction, they are considered as parts of the territory of the nation itself."—*Daniel Webster's Works*, vol. 6, pp. 306, 307.

duties of the masters and mariners, are regulated not by the *jus gentium*, or by that universal maritime law which forms a part of the *jus gentium*, but by the local law of the country where the contract is made, or between whose subjects it is made. The second is the inconvenience that might ensue if foreign seamen, in our ports and harbors, were allowed to litigate with masters upon facts arising out of their mutual contract still remaining in full force. The first consideration does not seem decisive of the present question. For, though the authority of the master over the seamen may be regulated by the municipal law of the country to which the parties belong, there runs throughout the laws of every country, on the subject, a general principle founded in the nature of things. The difficulty in the present case is not greater than in actions *ex contractu*, brought upon contracts made in foreign countries, and our municipal courts are not averse to taking cognizance of such suits, because they must be determined by the *lex loci*. The inconvenience of permitting suits to be brought by the crews of foreign vessels in our ports against the masters may be great, but we do not sit here to legislate, or to form diplomatic conventions with foreign powers ; and considerations of mere policy and expediency can form but a small ingredient in our decisions." He, therefore, and after citing a number of cases, concludes that, " If we have jurisdiction of this cause, we are bound to exercise it. If any court of common law in this country has that jurisdiction, this [the marine] court has it ; the legislature having invested us with a jurisdiction over this matter as ample as it could give, and having selected very apt expressions to convey the most extensive jurisdiction.

"The merchant vessels of a particular country are sometimes said to be an extension of the territory of that country ; and there is no doubt that, by the law of nations, every country has a right of jurisdiction

over all matters arising on board its vessels on the high seas; but it does not follow that this jurisdiction is exclusive " (1 *City Hall Rec.* 70).

I have quoted somewhat at length from this opinion of Mr. Justice WHEATON, because the book in which it is printed is an obscure publication and not readily accessible. So far as this decision throws light upon our inquiry, it is, that while it denies that the jurisdiction of a country over its own merchant vessels is, for the purposes of such a suit, exclusive, still it claims for the local court but a concurrent jurisdiction; and admits this concurrent jurisdiction may be superseded by "diplomatic conventions with the foreign power," and that of the foreign country extended, perfected, and made exclusive by the treaty; and only by this means, for courts of law should not legislate (*Story Conflict of Laws*, § 23).

The doctrine as stated in that case has been generally accepted for a reasonable and convenient rule; although the fundamental principle that such jurisdiction was discretionary in the court, and not a right in the complainant, appears more distinctly as the doctrine underwent subsequent consideration. Gardner v. Thomas, already cited, while declaring the right of the court in such jurisdiction, would restrain the exercise of the right in favor of commerce and a broader view of our amity to nations and national interests, rather than towards merely private individuals and their special interests. " Mariners might so annoy the master of a vessel as to break up the voyage, and thus produce great distress and ruin to the owners." The facts in this case sufficiently show the impropriety of extending jurisdiction, because it is a suit brought by one of the mariners against the master, both foreigners, for a personal injury inflicted on board of a foreign vessel on the high seas, but lying in port when the action was commenced, and, for aught that appears in

the case, intending to return to its own country without delay, other than which the nature of the voyage required. Under such circumstances, it is manifest that better policy ought to have induced the court below to have refused jurisdiction, so as to prevent the serious consequences which might result from the introduction of a practice, with regard to foreign mariners and vessels, destructive to commerce : since it must materially affect the necessary intercourse between nations, by which alone it can be maintained. The plaintiff, therefore, ought to have been left to seek redress in the courts of his own country. And for these reasons the judgment below was deemed " improvidently rendered," and was reversed. This decision reiterates that the courts are under no absolute obligation to entertain suits for mariners' wages between foreigners; and it may be thought remarkable, inasmuch as it reverses the judgment upon the express ground that the court below, having a discretional jurisdiction, had " improvidently " used that discretion when it retained jurisdiction, instead of leaving the sailor to seek redress in the courts of his own sovereign. Perhaps the safer opinion, it may be said in passing, is, that such matters which rest in the discretion of the court, are not the subject of review on appeal ; but restraining improvidence and abuse in judicial discretion by inferior tribunals is not without precedent (see an instance in *Sayer's Reports*, p. 217 ; Rex. *v.* Justices of Peace, &c.). The case of Johnson *v.* Dalton (1 *Cow.* 548) arose, also, in this court ; and the question on review was, whether the court below ought to have exercised jurisdiction in the case. The court there affirm that the jurisdiction in such cases rests in the exercise of a sound discretion, according to circumstances ; and, while affirming the judgment below, says : "the manifest inconvenience of allowing seamen at an intermediate port, and before

Petersen *v.* Brockelmann.

the voyage was ended, to harass the master by suits, has induced our courts to decline interference in ordinary cases, and leave the parties to seek redress in the courts of their own country." To illustrate the uncertainty and imperfection of this "habit" of assuming jurisdiction in other people's affairs, the case of Mason *v.* The Blaireau (2 *Cranch*, 264) may be referred to. It was a libel for salvage. The parties interested, with one exception, were not Americans. Doubts were suggested as to the jurisdiction. Chief Justice MARSHALL said : "Upon a reference to authorities, the point does not appear to have been ever settled. These doubts seem rather founded on the idea that, upon principles of general policy, this court ought not to take cognizance of a case entirely between foreigners, than from any positive incapacity to do so. On weighing the considerations drawn from public convenience, those in favor of the jurisdiction appear much to overbalance those against it, and it is the opinion of this court, that whatever doubts may exist in a case, there ought to be none where the parties assent to it." This in a salvage case, in an admiralty court, and where not municipal but the law of nations is administered. Some of our own courts of admiralty, however, have declined to allow jurisdiction in like cases: as in Thompson *v.* The Nanny (*Bee Adm.* 217), a suit commenced by foreign seamen for their wages, was left to the courts of their own country ; and, in accord with this policy of non-intervention are the cases of Thompson *v.* Catharina (*Pet. Adm.* 104), and of Willendson *v.* The Forsoket (*Id.* 197), and Gonzales *v.* Minor (2 *Wall. Jr.* 354). It has been suggested in Salez *v.* Souza, that these decisions were in admiralty, a court which, being recognized by the law of nations, feels itself at liberty to exercise a species of comity towards the tribunals of other countries, which a court of common law cannot exercise. A distinction which I state

rather than adopt, as the jurisdiction is discretionary in both courts.

In 1846, an action for seaman's wages was commenced in this court, and finally disposed of on appeal by the superior court. The defense protested that there was a treaty between this country and Norway and Sweden, by which jurisdiction in such cases was vested exclusively in the consul at this port. The court overruled that objection, and assumed jurisdiction, notwithstanding the interdiction of the treaty ; and gave judgment for the plaintiff. The reasons for this are not reported ; but it is fair to presume that this court, as then constituted, regarded the treaty as a nullity, so far as it attempted to supersede the jurisdiction of a State court. The judgment was of course reversed, and SAMUEL JONES, Ch. J., formerly an associate judge of the marine court, delivering the opinion, after deciding that the case clearly came within the treaty, and superseded the jurisdiction of our courts, clears up a point which might be raised in this cause ; and that is, that the seaman having shipped in New York, an intermediate port in the voyage, as Rio de Janeiro was in the case before us, took the transaction out of the treaty, and that it applied only to the crew who originally shipped in Sweden. That learned judge says : "Such a construction of it would be entirely too narrow ; the custom of shipping sailors in foreign ports by vessels of all nations is general, and necessarily must exist; and persons who thus ship voluntarily bring themselves under the government and jurisdiction of the country on board whose vessel they ship. A seaman has no right to appeal to the courts here as long as he belongs to a Swedish vessel." (Norberg v. Hillgreu, 5 *N. Y. Leg. Obs.* 177). The recent case *Exp.* Newman, in the supreme court of the United States (14 *Wall.* 169), seems to end all need of further controversy on this phase of our inquiry, and

Petersen *v.* Brockelmann.

leads us by suggestion to the next point. There the court says: "The better opinion seems to be that, independent of treaty stipulations, there is no constitutional or legal impediment to the exercise of jurisdiction in such a case. Such courts may, if they see fit, take jurisdiction in such a case, but they will not do so, as a general rule, without the consent of the representative of the country to which the vessel belongs, where it is practicable that the representative should be consulted. His consent, however, is not a condition of jurisdiction, but is regarded as a material fact to aid the court in determining the question, whether jurisdiction in the case ought or ought not to be exercised."

The marine court is one of common law, without admiralty or maritime jurisdiction. It proceeds in suits for seaman's wages as in any action upon a contract for work and labor; when against a non-resident it may on special application issue, in the action and as mesne process, a writ of attachment against his personal property; and if that non-resident's personal property should chance to be his merchant vessel then lying in this port, and perhaps belonging to a foreign nationality, and he himself a subject of that nation, it is somewhat difficult for me to apprehend the distinction practically between that seizure and custody to abide the event of a litigation, and the more speedy and proper proceeding by libel in admiralty (Taney, Ch. J., his dissenting opinion in Taylor *v.* Carryl, already cited by me). The difference is one of mere procedure; coupled with this inequitable consequence, that in some cases it might assure to the plaintiff a precedence of his debt above that of his fellow-seamen. To commerce the effect and inconvenience are the same: for the vessel is seized in port and held in the custody of the law to abide the suit in either procedure. But the distinction has become recognized by judicial "habit," and we

can only mitigate this kind of superinduced jurisdiction, in those cases, by exercising or not exercising the right, as in our discretion may appear best for all the parties.   When there is a treaty, or even where there is no treaty and the official representative of the country to which the vessel belongs objects to the litigation proceeding further, the court should dismiss the suit, and leave the seaman at liberty to seek relief through his consul or in the courts of his own nation.

Conceding that this court, therefore, has jurisdiction, in its discretion, in suits brought as actions under our Code of Procedure, in common with all other courts in and of the State, yet, *where a vessel is attached in such a suit for seaman's wages, the jurisdiction is, in my estimation, very doubtful.*

A vessel belonging to the merchant service of a foreign nation has peculiar relations to the policy and territory and sovereignty of that nation.  The subject, in its necessary associations, combines with and enters into the organization and conduct of international commerce   A consideration of the matter, in the light of international polity and the regulations and needs of free commercial intercourse, will disclose the propriety, if not necessity, of removing this fruitful source of a vexatious litigation from the fluctuating and dubious entertainment of local courts into the exclusive jurisdiction and charge of the country to which the vessel belongs.

From these citations, authorities and principles, it is obvious that no treaty regulating the subject of foreign merchant vessels in port, their officers, crews, and their interests and mutual obligations, and all other things concerning the internal affairs of the vessels, can be pronounced, or inferred to be, an effort to maintain tribunals independent of our own, in our territory, for adjudicating any difference of which our local courts can claim an absolute jurisdiction ; nor is

such a treaty contrary to the spirit of any institution of our country, or of our State, which now occurs to my apprehension.   It is, in truth, only definitely and authoritatively placing those differences exclusively in the charge of the particular sovereignty to which our courts, when declining to afford jurisdiction, have so frequently sent the litigants.   Instead of being adverse to the independence and jurisdiction of our courts, the terms of such a treaty accord with the commendable judicial policy of non-intervention.

A private vessel in the merchant service is of the territory of the particular country to which it belongs·; it finds its protection and rights in the flag which floats over it; its mission is of commerce ; free unembarrassed operation is the life-giving principle and encouragement of commercial intercourse between nations; and seamen are part of the vessel, and should be, unless the freedom of commerce is to be destroyed, as exempt from a local jurisdiction as is the vessel itself; no further, but certainly to that extent.   For commerce is "the common bond of nations, and merchants are considered as forming one family, although dispersed in different States" (*Pardessus, Com. Law of France*, t. 5, p. 43 ; 1 *Kent Comm.* 32).   This exemption of the ship and the ship's company while in port is, of course, subject to the rights of our citizens and to the preservation of the public morals and peace of our people.   A very decided and compendious declaration of the principle and rules is, with citations of various decisions, given by Halleck in his work on *International Law and Laws of War*, at page 172 : "The rule of law, and the comity and practice of nations, allow a merchant vessel of one State, coming into an open port of another, voluntarily, for the purpose of lawful trade, to bring with her, and keep over her, to a very considerable extent, the jurisdiction and authority of the laws of her own country ; excluding

I.—14

to this extent, by consequence, the jurisdiction of the local law. This jurisdiction of a nation over its vessels, while lying in the port of another, is wholly exclusive. For any unlawful acts done by her while thus lying in the port of another State, and for all contracts entered into while there, by her master or owners, she is made answerable to the laws of the place. The comity and practice of nations have established the rule of international law, that such vessel so situated, is, for the general purpose of governing and regulating the rights, duties, and obligations of those on board, to be considered as a part of the territory of the nation to which she belongs. . . . It, therefore, follows, that, with respect to facts happening on board, which do not concern the tranquillity of the port, or persons foreign to the crew, or acts committed on board while such vessel was on the high seas, are not amenable to the territorial justice. All such matters are justiciable only by the courts of the country to which the vessel belongs." In other words, no court " administers justice in general," especially as to vessels engaged in commercial intercourse and coming into our ports from other nations; and vessels so engaged are a peculiar species of personal property, having an interest to promote beyond their own intrinsic value.

In the interests of commerce, various modifications of internal police have been made by several nations. The general policy of France is quite exclusive ; even those foreigners who have entered into a contract in a foreign country are not allowed to sue each other upon the contract before a French tribunal, unless one of the foreigners has acquired a French domicil before the contract was entered into (*Code de Commerce*, art 631) ; yet, while declining to make its own courts the resort wherein the litigated rights and obligations of foreigners may be enforced, that nation has established

Petersen v. Brockelmann.

"Tribunals of Commerce," which have jurisdiction only between all persons in commercial questions arising from acts done in France; and a foreigner cited by another before the Tribunal of Commerce, cannot, unless by special convention, &c., decline the jurisdiction (*Henry on Foreign Law*, Appendix C, § 1; *Fœlix Traité du Droit International*, t. i, § 148; and see the remarkable cases of the two American vessels, The Newton and The Sally, *Ortolan, Régles International de la Mer*, tom. i. pp. 293–298). Some, however, contend that the rule is, that the tribunals there are competent to entertain suits between one foreigner and another, but they are not bound to do so. The law there is, also, by no means settled (see note to Zacharie, *Droit Civil Français*, tom. 1, p. 87, n. 12, and cited by Chief Justice Cockburn in his pamphlet on *Nationality*, p. 158).

This modification of a policy and the maintaining of a distinct tribunal of commerce are concessions to the spirit and convenience of modern commercial requirements, and admit the feasibility and propriety of the matter being regulated by a "special convention" between commercial nations. Indeed, the institution of a special judge to administer justice between even resident foreigners and native citizens, was a peculiar feature of early Roman jurisprudence; and the functions of the Prætor Peregrinus were those belonging to the administration of that law which enlightened reason teaches all nations, which should be observed by them, and under which all kinds of personal interests are comprised (*Sandars, Institutes of Justinian*, lib. i, title 2, § 2).

The inherent sovereign right of every nation to guard her internal administration of justice, and keep it within bounds agreeable to her own policy, is unquestionable; for "the jurisdiction of the nation, within its own territory, is necessarily exclusive and

absolute ; it is *susceptible of no limitation not imposed by itself*," or with its own free consent (MARSHALL, Ch. J., in The Exchange, 7 *Cranch*, 135).

Such limitation has been imposed by some nations upon themselves, and by others affected by treaty stipulations with independent countries. It is true that in the United States of America, in Great Britain, in the Germanic States, in Holland, foreigners equally with natives are allowed to bring personal actions against foreigners before the tribunals of the country, but, says Mr. Twiss, in his work on *The Laws of Nations considered as Independent Political Communities*, in that portion wherein he treats of the rights and duties of nations in time of peace (§ 157), "it seems clear upon general principles, that *it is a matter of civil polity to decide in what manner that jurisdiction should be exercised between foreigners.* In some countries, such as Spain and Portugal, there have been special tribunals constituted under treaty engagements and charged with the jurisdiction over questions in which foreigners are concerned. . . . The treaty of 1654, concluded between the commonwealth of England and the kingdom of Portugal, provided for the appointment of a judge conservator of the British nation, whose province it was to decide all actions between British subjects not having a Portuguese domicil by the law of nations, and all actions between British and Portuguese subjects." There was, at a later date, an analogous treaty between France and Portugal in regard to French subjects.

These were remarkable privileges certainly ; but they illustrate by historical precedent how the policy of independent nations adapts itself to the needs and conveniences of the genius of commerce, and yields to all necessary regulations for the encouragement and protection of international commercial intercourse.

*Statuta suo clauduntur territorio, nec ultra territorium disponunt,* is no longer the positive, exceptless rule.* The civil legislation of one nation may, through the comity of another independent nation, have effect given to it, beyond the limits of its specific territory, in differences between its own subjects and over their personal property.

I understood it to be conceded, on the argument, that the parties to this suit are both foreigners ; but if I should be incorrect in my recollection as to this circumstance, yet it is clear that the owner and the vessel are of the empire of Germany, and I am bound, in the absence of positive evidence to the contrary, to ascertain the national character of the seaman from the national character of the vessel, by a necessary inference. A sailor is part of the vessel, and the vessel is national territory. While there, whether a natural subject or not, he certainly owes a local allegiance, which, for all the purposes of liability to that nation's laws and maritime regulations, is as full and comprehensive as that of a natural allegiance. "Persons who ship voluntarily, bring themselves under the government and jurisdiction of the country on board whose vessel they ship" (Norberg *v.* Hillgreu, cited above).

The power to make treaties is lodged by the constitution in our national government exclusively (*Story on Const.* §§ 1507, 1508, 1509). National affairs with foreign nations and in a special sense those concerning commerce, are also placed exclusively under national controlment. The States have no power over those subjects.

---

* " Of strict right all the laws made by a sovereign have no force or authority, except within the limits of his domains. But the necessity of the public welfare has introduced some exceptions in regard to civil commerce." *De droit étroit, toutes les lois, que fait un souverain, n'ont force et autorité que dans l'étendue de sa domination ; mais la nécessité du bien public et général des nations a admis quelques exceptions dans ce qui regarde le commerce civil.* 1 *Boullenois, Prin. Gén.* 6, p. 4.

In their nature those subjects belong to national policy, solicitude and protection. Commerce, to be prosperous, must be free; and in a free port no restraint should be imposed by municipal law beyond that which is absolutely required to regulate its own good order and protect the rights of its own residents. Treaty stipulations become "a particular law to the parties themselves," and supersede all other general law on the particular matter.

The treaty-making power of our national government is sufficient, under our Constitution, to reach the objects of such conventions as that of 1872 with the empire of Germany, and to supersede not only the national courts but, as a matter of course, those of each state, in matters relating so entirely to mere comity between nation and nation; and to uphold by its own force a law thereupon which shall be paramount throughout the country. Congress has already gone to a questioned—some contend to a questionable—degree of authority in this respect relating to the rights of individual foreigners (Fairfax *v.* Hunter, 7 *Cranch*, 627; Ware *v.* Hylton, 3 *Dallas*, 242; 8 *Op. Att.-Gen.* 415; *Halleck International Law*, 157, where cases are cited in support of this power in the general government). But there can be no doubt that the regulation of the privilege of foreigners to resort to courts in our country is fully under the control of the Congress, and that it has power to authorize another nation, "by and with the advice and consent of the Senate," to establish and maintain in our sea-ports a special consular tribunal to hear and decide, or make other disposition, of "differences of every kind which may arise, either at sea or in port, between the captains, officers, and crews, and especially in reference to wages and the execution of mutual contracts," and to place under such consular jurisdiction the "exclusive charge of the in-

Petersen v. Brockelmann.

ternal order of the merchant vessels of their nation."
And this is what the treaty of 1872 has effected.

The consular convention between the United States
of America and the German Empire was proclaimed
June 1, 1872 (17 *U. S. Stat. at L.* Treaties, p. 125, art.
13), is the law of this court, and "the supreme law of
the land" (*Const. U. S.* art. 6). There was a former
treaty with Prussia, made in 1828, on this subject. I
repeat what should be unnecessary, when I say that
the judiciary must always regard treaties, not as mere
political contracts, but as law. And, impressed with
the instances that have come to my knowledge during
the consideration of the questions of law in this cause,
wherein courts have denied treaties the respect due to
positive law, this court wishes to repeat, for itself, that
treaties are of "the supreme law of the land," and "con-
sequently to be regarded in courts of justice as equiva-
lent to an act of the legislature, whenever it operates
of itself without the aid of any legislative proviso"
(Foster *v.* Neilson, 2 *Pet.* 314; also United States *v.*
Arredondo, 6 *Id.* 735 ; *Story on Const.* § 183 ; *Exp.*
Newman, 14 *Wall.* 152).

The object o this "consular convention" is that
the foreign commerce of Germany, while its merchant
vessels are in our ports, should not be interrupted and
delayed by actions at law in our local courts ; and, to
that end, all things convenient and necessary to that
commerce are vested in the jurisdiction and charge of
the commercial representative and agent of that empire,
and, by its terms, not only is the whole subject, in all
its amplitude, whether *in rem* or *in personam*, removed
into that consular jurisdiction exclusively, but the pro-
hibition is added that : "Neither any court or author-
ity shall, on any pretext, interfere in these differences,
except in cases where the differences on board ship
are of a nature to disturb the peace and public order in
port or on shore, or when persons other than the offi-

cers and crew of the vessel are parties to the disturbance" (art. 13).

This treaty stipulation, then, takes away all pretense for the further exercise of a discretional or any other jurisdiction over merchant vessels or the ship's company in those cases. It has been objected, by the counsel for the plaintiff, that this treaty does not specify the owner (in the case *Exp.* Newman, it was that its terms did not include a proceeding *in rem* against the vessel) ; but the answer to this is, that the treaty, in its object and terms, includes the whole subject, and draws into its protection and jurisdiction all persons and things belonging to and interested in it. No narrow interpretation must defeat the benefit and remedy intended.

This merchant service is now exclusively under the care of the agent universally regarded as peculiar to all maritime nations, and best fitted to promote the object and utility of the convention. The consular office is born of the nature of commerce, and the perfecting by this treaty of a comprehensive jurisdiction over all differences that would be likely to disturb the mission of the vessel in its commercial adaptation is in harmony with the origin and design of the office. They are not diplomatic ministers (1 *Kent Comm.* 41), but strictly commercial representatives ; they have a right, by law, to interpose for the restitution of property belonging to the subjects of the country represented (1 *Curtis*, 87 ; 1 *Mason*, 14 ; 6 *Wheat.* 152 ; 10 *Id.* 66 ; 2 *Wall. Jr.* 59). The office of consul is not of modern commercial need merely ; officers with powers and duties corresponding to those of modern consuls were employed by the ancient Athenians, who had them stationed in commercial ports with which they traded (1 *St. John, Mann. and Cus. of Ancient Greece*, 283). They were appointed, and became prominent as agents about the middle of the twelfth century, by the maritime states of the Mediterranean, and their numbers have increased with

Petersen *v.* Brockelmann.

the development and extension of commerce (2 *Ward's Law of Nations*, 198). In the Levant maritime judges are yet called consuls, an appellation which has come down to them from the Middle Ages. The treaty really creates nothing but a special tribunal for deciding differences among persons of the same allegiance, and respecting rights and obligations in which our own citizens are in no way interested, unless we imagine it a public benefit to invite into our domestic tribunals entangling litigation, so as to extend the area for "administering justice in general." There is no constitutional "right or immunity," no institution or polity of our country, against the spirit or letter of which this treaty can be intelligently said to come in conflict. On the contrary, it is in commendable accord with the broad opinion expressed in those principles and authorities which have come under reflection in the course of the preceding researches, and of which the treaty itself in "its entire scope and meaning" is an express declaration.

The sovereignty of a foreign and friendly country thereby has resumed, and perfects in its own control, a jurisdiction hitherto imperfect; a jurisdiction over its own commercial territory, affairs, and people; a jurisdiction to which its own subjects, while in a foreign port, can appeal, and find summary redress and protection. It is the resumption, in no limited degree, of a sovereign right common to the citizens of that elder power to which the Germany of this day is, historically, the political successor. Paul asserted his Roman citizenship, and appealed to Cæsar; a Roman by birth, and of "no mean city," he invoked a principle of political jurisprudence, upon which this right was based, comprised in the maxim, *Actor sequitur forum Rei*, according to which every defendant is entitled to be sued before his natural judge. The particular sovereignty to which he appealed was then

marching its legions and establishing its empire in "the fairest part of the earth;" but it was yet to formulize and bequeath to mankind that jurisprudence "founded in nature and not opinion," and which was destined, exempt from mutability and decay, to outlive the military achievements of the empire.

The motion to dismiss the cause is granted, and on these grounds, each independent of the other :—

*First.* The local courts should *not* entertain jurisdiction in such a case between two foreigners, when the diplomatic or commercial official representative of their country protests. The authorities which I have cited concur in this as proper.

*Second.* The treaty of 1872, in my opinion, supersedes all jurisdiction in such cases, discretional and absolute.

The attachment, and all proceedings by virtue of it, are vacated ; and the cause will be struck from the records of the court (The Mayor *v.* Cooper, 6 *Wall.* 247.; The Alicia, 7 *Id.* 572).

JOACHIMSEN, J., delivered an opinion concurring in the decision and on the second ground stated ; but expressing no dissent as to the first.

NOTE.—" It is natural to consider the vessels of a nation as parts of its territory. . . . . . By the comity of the law of nations and the practice of modern times, merchant vessels entering open ports of other nations for the purpose of trade, are presumed to be allowed to bring with them, and to retain, for their protection and government, the jurisdiction and laws of their own country." (Daniel Webster, in his correspondence with Lord Ashburton. *Webster's Works*, vol. 6, page 308.)

In the Parliament Belge (28 *Weekly R.* 642), the English Court of Appeal reversed the decision of Sir R. PHILLIMORE, and held that a mail packet belonging to a foreign sovereign, and officered by him, cannot be proceeded against in the admiralty court, even by action *in rem*, nor because the vessel is employed in commerce by carrying passengers and goods for hire. The doctrine of the court is, that, as a consequence of the absolute independence of every sovereign authority, and of the international comity which induces every

Petersen v. Brockelmann.

sovereign State to respect the independence of every sovereign, each and every one declines to exercise, by means of any of its courts, any of its territorial jurisdiction over the person of any sovereign or ambassador of any other State, or over the public property of any ambassador, though such sovereign, ambassador, or property be within its territory, and therefore, but for the common agreement, subject to its jurisdiction.

An action *in rem*, being an indirect method of impleading the owner, cannot be brought against the property of a foreign sovereign, and the immunity of a public ship is not lost by her being used subordinately and partially for trading purposes.

The court hold that when, on behalf of the sovereign impleaded, the plea that the vessel is a public vessel belonging to him, and in his possession, has been interposed in the usual way, the court cannot inquire into the fact, for to submit to such an inquiry before the court would be to submit to its jurisdiction.

Under the treaty of 1871, between the United States and the German Empire, the courts of the State of New York have no jurisdiction over an assault and battery committed by the mate of a German vessel, upon a sailor thereof, both being German citizens, on board of such a vessel while lying in the port of New York, unless it is of such a character as to disturb the peace and public order (People *ex rel.* Schumacker *v.* N. Y. Marine Court, 6 *Hun,* 214).

The following authorities are taken from Moak's notes to Reg. *v.* Armstrong (14 *Eng. R.* at p. 640):

"An offense committed on board a ship at sea is an offense against the nation to which the vessel belongs, even though the offender be a foreigner, and may be punished thereby in the same manner as if such offense had been committed within the territory of the nation to which the vessel belongs (Regina *v.* Lopez, 7 *Cox Cr. Cas.* 431; *Dearsly & Bell C. C.* 525; 1 *Stark. Crim. Pl.* [2 ed.] 17 *et seq.*). Though the prosecution must prove the vessel belonged to a citizen of the country (United States *v.* Imbert, 4 *Wash. C. C.* 702). This may be done without producing the register or a copy thereof. It is sufficient to show orally that she belongs to British owners, and carried the British flag (Reg. *v.* Allen, 10 *Cox,* 405; Regina *v.* Leberg, *L. R.* 1 *C. C. Res.* 264; 11 *Cox,* 520). But see United States *v.* Imbert, 4 *Wash. C. C.* 702: Regina *v.* Bjornsen, *Leigh & Cave,* 545: 10 *Cox,* 74). The courts of one nation have no jurisdiction of offenses committed at sea upon vessels of another, though the party injured die upon the territory of the latter (Regina *v.* Lewis, *Dearsly & Bell C. C.* 182; 7 *Cox,* 277)." For further notes upon this subject, see 14 *Eng. R.* at p. 640.